**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **MARY L. MCCRACKEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05 CV107 LMB** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Mary L. McCracken for Disability Insurance Benefits under Title II of

the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act.

This case has been assigned to the undersigned United States Magistrate Judge pursuant to the

Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c).

Plaintiff has filed a Brief in Support of Complaint. (Document Number 20). Defendant has filed

a Brief in Support of the Answer. (Doc. No. 21).

## Procedural History

On June 11, 2003, plaintiff filed her applications for Disability Insurance Benefits and

Supplemental Security Income, claiming that she became unable to work due to her disabling

condition on December 30, 2000. (Tr. 28, 73). Plaintiff's applications were denied initially, and

following an administrative hearing, plaintiff's claims were denied in a written opinion by an

Administrative Law Judge (ALJ), dated November 24, 2004. (Tr. 51-53, 10-15). Plaintiff then

filed a request for review of the ALJ's decision with the Appeals Council of the Social Security

Administration (SSA), which was denied on April 30, 2005. (Tr. 5, 2-4). Thus, the decision of

the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481

(2003).

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on May 17, 2004. (Tr. 244). Plaintiff was

present and was represented by counsel. (Id.). The ALJ began by admitting a number of exhibits

into evidence. (Id.). The ALJ noted that plaintiff is seeking benefits under both Title II and Title

XVI, and that her insured status had not yet expired. (Id.). Plaintiff's counsel indicated that Dr.

Komatireddy had recently tested plaintiff for lupus,[1] and that the results had not yet been

obtained. (Tr. 245). The ALJ granted plaintiff 60 days to obtain the test results from Dr.

Komatireddy. (Tr. 246).

Plaintiff's counsel then made an opening statement. (Id.). Plaintiff's counsel first

requested that plaintiff's alleged onset date be amended to November 21, 2002, which is the date

of a prior denial by an ALJ. (Id.). Plaintiff's counsel stated that plaintiff's symptoms have

worsened since the last denial. (Id.). He stated that plaintiff has been diagnosed with

---

[1]An inflammatory connective tissue disease with variable features, frequently including
fever, weakness and fatiguability, joint pains or arthritis resembling rheumatoid arthritis, diffuse
erythematous (red) skin lesions on the face, neck or upper extremities, and a positive LE cell test.
Stedman's Medical Dictionary, 1037 (27th Ed. 2000).

fibromyalgia[2] and possibly lupus since her last denial.  (Id.).  Plaintiff's counsel stated that plaintiff

has been experiencing depression and nervousness.  (Id.).  Plaintiff's counsel further stated that

plaintiff underwent a hysterectomy[3] in April 2003.  (Tr. 247).  In addition, plaintiff's counsel

indicated that plaintiff has been experiencing problems with swelling in her hands, and knots on

her knuckles.  (Id.).  Finally, he stated that plaintiff's arthritis[4] in her hands, knees, and spine has

worsened.  (Id.).

The ALJ then examined plaintiff, who testified that she was 46 years of age, is separated

from her husband, and lives alone in a mobile home.  (Tr. 247-48).  Plaintiff stated that she owns

both the mobile home and the property upon which it sits.  (Tr. 248).  Plaintiff testified that she

has three sons, who are 23, 24, and 26 years of age.  (Id.).  Plaintiff stated that her sons all live on

their own.  (Id.).  Plaintiff testified that she graduated from high school.  (Id.).  Plaintiff stated that

she is right-handed, five-feet two-inches tall, and weighs 217 pounds.  (Id.).  Plaintiff testified that

she has never been in the military and has never been in jail.  (Tr. 248-49).

Plaintiff stated that she receives food stamps in the amount of $141 a month, which is her

only source of income.  (Tr. 249).  Plaintiff testified that she does not receive Medicaid benefits,

and that she is covered under her husband's health insurance.  (Id.).  Plaintiff stated that she and

her husband separated over two years prior to the hearing, after almost 25 years of marriage.

(Id.).  Plaintiff testified that her marriage ended when her children left home.  (Id.).  Plaintiff

---

[2]A syndrome of chronic pain of musculoskeletal origin but uncertain cause.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body both above and below the waist, as well as in an axial distribution; additionally there must be point tenderness in at least 11 of 18 specified sites.  Stedman's at 671.

[3]Complete removal of the uterus.  Stedman's at 867.

[4]Inflammation of a joint.  Stedman's at 149.

stated that her children help pay for her utilities.  (Id.).  Plaintiff testified that her husband is

employed as a mechanic at Royal Oak Enterprises, which is a charcoal plant.  (Tr. 250).  Plaintiff

stated that her husband also helps her pay utility bills when her children are unable to pay them.

(Id.).

Plaintiff testified that the last job she performed was a sewing job at Mailor Fabrics.  (Id.).

Plaintiff stated that she sewed sleeves on shirts at this position.  (Id.).  Plaintiff testified that she

worked at this position for six to eight months, until April of 2002.  (Id.).  Plaintiff stated that she

quit the position to have bilateral carpal tunnel[5] surgery.  (Tr. 251).  Plaintiff testified that she

cannot return to this position because her hands become numb and she experiences shoulder and

arm pain due to the fibromyalgia.  (Id.).  Plaintiff stated that Dr. Komatireddy, her rheumatologist,

diagnosed fibromyalgia.  (Id.).

Plaintiff testified that she has a driver's license, although she does not drive often.  (Tr.

251).  Plaintiff stated that she does not do laundry because she cannot carry the basket of clothes.

(Tr. 253).  Plaintiff testified that her daughter-in-law does her laundry.  (Id.).  Plaintiff stated that

she smokes one package of cigarettes a day.  (Id.).  Plaintiff testified that she smokes generic

cigarettes, which cost $1.99 a package.  (Id.).  Plaintiff stated that she lights her cigarettes with a

lighter, and that she holds the lighter in her right hand and the cigarette in her left hand.  (Id.).

Plaintiff testified that she goes to the grocery store once a month.  (Id.).  Plaintiff stated that her

son takes her to the grocery store.  (Tr. 254).

Plaintiff testified that she does not believe she could work at a job where she sits at a desk

---

[5]Carpal tunnel syndrome is the most common nerve entrapment, characterized by
nocturnal hand paresthesia and pain, and sometimes sensory loss and wasting in the median hand
distribution.  Stedman's at 1749.

all day because her shoulders, neck, and her knees hurt.  (Id.).  Plaintiff stated that after she sits

for a while, she cannot get back up due to her knee.  (Id.).  Plaintiff testified that both of her

knees hurt due to osteoarthritis,[6] although her right knee is worse.  (Id.).  Plaintiff stated that she

has two grandchildren and that she does not provide daycare for them.  (Id.).  Plaintiff testified

that she spends her days watching television.  (Tr. 255).  Plaintiff stated that her pain is mostly in

her hands, arms, and shoulders.  (Id.).  Plaintiff testified that the carpal tunnel surgery did not

provide any relief.  (Id.).

Plaintiff's attorney next examined plaintiff, who testified that she has not received any

specialized training of any kind.  (Id.).  Plaintiff stated that she can read and write and she can add

and subtract.  (Id.).  Plaintiff testified that she cannot multiply or divide.  (Id.).  Plaintiff stated

that she cannot make change, although she can operate a calculator.  (Tr. 255-56).

Plaintiff testified that at her prior ALJ hearing she was experiencing problems with her

hands and arms due to arthritis, and she had a shoulder impingement.  (Tr. 256).  Plaintiff stated

that she also had fibromyalgia at the last hearing.  (Id.).  Plaintiff testified that her arthritis has

worsened since the last hearing.  (Id.).  Plaintiff stated that she has knots on her hands that were

not present at the last hearing.  (Id.).  Plaintiff testified that her doctors have looked at these knots

but they did not say anything about them.  (Tr. 257).  Plaintiff stated that the pain in her hands has

become worse and her gripping ability has worsened.  (Id.).  Plaintiff testified that she

occasionally has difficulty lighting cigarettes.  (Id.).  Plaintiff stated that she was diagnosed with

---

[6]Arthritis characterized by erosion of articular cartilage, either primary or secondary to
trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of
subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result.
Stedman's at 1282.

fibromyalgia by Dr. Komatireddy in late 2003. (Id.). Plaintiff testified that she was experiencing problems with her back at the last hearing. (Tr. 258). Plaintiff stated that she experiences constant shoulder pain, and she cannot lift her arm above her head. (Id.). Plaintiff testified that she experiences neck pain, and that it hurts to move her head from side to side. (Id.).

Plaintiff testified that she began experiencing menstrual problems in early 2002. (Id.). Plaintiff stated that she was bleeding and cramping constantly and had to stay in the house all day. (Tr. 259). Plaintiff testified that she underwent a hysterectomy on April 11, 2003. (Id.). Plaintiff stated that she has not had any problems since the hysterectomy. (Id.). Plaintiff testified that she took hormones for about a year after the hysterectomy. (Tr. 260). Plaintiff stated that she experienced hot flashes and depression after she stopped taking the hormones. (Id.).

Plaintiff testified that she recently began feeling depressed. (Id.). Plaintiff stated that Dr. Komatireddy indicated that the depression may be connected to the lupus. (Id.). Plaintiff testified that the depression causes her stare out the window and not get anything done. (Id.). Plaintiff stated that she also experiences difficulty sleeping and only sleeps about two hours a night. (Id.). Plaintiff testified that her medications cause her to become drowsy. (Tr. 261).

Plaintiff stated that she also has Raynaud's disease,[7] which causes tingling and coldness in her hands. (Id.). Plaintiff testified that her hands become cold and numb and turn white in color. (Id.). Plaintiff stated that she has no feeling in her hands until the color returns. (Id.). Plaintiff testified that this occurs two to three times a week, and it is not related to her carpal tunnel syndrome. (Id.). Plaintiff testified that the carpal tunnel syndrome caused tingling and numbness

---

[7]Spasm of the digital arteries, with blanching and numbness or pain of the fingers, often precipitated by cold. Stedman's at 1365.

in her hands.  (Id.).  Plaintiff stated that the surgery did not help these symptoms or the pain in her hands.  (Id.).

Plaintiff testified that she has arthritis in her knees.  (Id.).  Plaintiff stated that the right knee is worse and that it swells.  (Tr. 261-62).  Plaintiff testified that she has had fluid drained out of her right knee three times.  (Tr. 262).  Plaintiff stated that her knee does not bother her when she sits for long periods, but it hurts when she stands up.  (Id.).  Plaintiff testified that she cannot sit all day because her neck and back would hurt.  (Id.).  Plaintiff stated that she can sit for 30 minutes to an hour.  (Id.).  Plaintiff testified that she stopped about four times during her two-and-a-half hour trip to the hearing.  (Id.).  Plaintiff stated that her hands bother her when she drives.  (Id.).

Plaintiff testified that she worked for a wood products company for almost a year operating a nail gun, saw, and forklift.  (Tr. 263).  Plaintiff stated that she also worked at Lucy Lee Hospital as a housekeeper.  (Id.).  Plaintiff testified that she worked at Our Place, which is a bar and grill, as a server.  (Id.).  Plaintiff stated that she also worked for Butler County Health cleaning clients' homes and cooking.  (Id.).  Plaintiff testified that she has tried to do some housekeeping to make some extra income.  (Id.).  Plaintiff stated that she has not done any housekeeping in eight or nine months.  (Id.).  Plaintiff testified that she worked up to four hours a week doing housekeeping.  (Tr. 264).  Plaintiff stated that she only worked 15 to 30 minutes at a time before she would have to take a break.  (Id.).  Plaintiff testified that she was paid hourly when she did housekeeping.  (Id.).  Plaintiff stated that she had to quit this work because she could no longer bend over, and could not use a vacuum cleaner, dust, or shampoo carpets.  (Tr. 264-65).

The ALJ then examined the vocational expert, Dr. John Grenfell, who testified that plaintiff's past work as a sewing machine operator is classified as light and low-level semi-skilled. (Tr. 265). Dr. Grenfell stated that plaintiff's positions in housekeeping as light and unskilled. (Tr. 266). Dr. Grenfell described plaintiff's work in the wood mill operating a forklift as medium, and plaintiff's positions as a barmaid and cook as light. (Id.).

The ALJ then asked the vocational expert to assume a hypothetical individual who can occasionally lift and carry up to 20 pounds and frequently lift and carry ten pounds; has no limitation in sitting; can stand and walk for about six hours in an eight-hour workday; cannot forcefully grip or grasp; cannot do overhead work; can only occasionally push and pull with the right upper extremity; must avoid vibration to the hands; must avoid extreme temperatures; and can occasionally bend, stoop, and engage in postural activities. (Id.). Dr. Grenfell testified that the only one of plaintiff's past jobs that such an individual could perform would be that of a waitress or barmaid. (Tr. 267). Dr. Grenfell stated that there are 20,400 waitresses and barmaids at the light level in Missouri and one million nationally. (Tr. 268).

The ALJ next asked Dr. Grenfell to assume an individual who cannot lift or carry over ten pounds; can stand and walk about two hours in an eight-hour workday; can sit for about six hours in an eight-hour workday; cannot forcefully grip or grasp; cannot do overhead work; can occasionally push and pull with the right upper extremity; must avoid vibration to the hands; must avoid temperature extremes; can occasionally bend and stoop; and must stand or walk around for five minutes after sitting continuously for 45 minutes. (Tr. 266-67). Dr. Grenfell testified that all of plaintiff's past work would be precluded by these limitations because all of plaintiff's past jobs involve standing constantly. (Tr. 268). Dr. Grenfell stated that the individual could perform a

variety of unskilled, sedentary jobs with these limitations. (Id.). Dr. Grenfell testified that the individual could work as a surveillance systems monitor and there are 110,000 of such jobs nationally and 3,500 in Missouri. (Tr. 268-69). Dr. Grenfell stated that the individual could work as a charge account clerk, and that there are 46,000 of such jobs nationally and 2,500 locally. (Tr. 269). Dr. Grenfell testified that the individual could also perform sedentary inspection jobs, and that there are 70,000 such jobs nationally, and 2,000 in Missouri. (Id.).

Plaintiff's attorney then examined Dr. Grenfell, who testified that the waitress and barmaid positions do not require standing or walking more than six hours a day. (Tr. 270). Dr. Grenfell explained that these positions involve the performance of several job duties while sitting. (Id.). Dr. Grenfell testified that an individual working at any of the positions he mentioned would be terminated if her or she fell asleep on the job due to the side effects of medications. (Id.).

The ALJ then indicated that he would like to see the results of the testing for lupus. (Id.). The ALJ granted plaintiff 60 days to obtain these records. (Tr. 271). He indicated that plaintiff could also submit other relevant evidence during this time. (Id.).

## B. **Relevant Medical Records**

The record reveals that plaintiff was treated at the Ripley County Family Medical Clinic from December 1999 to May 2, 2003, for various complaints, including all over pain, chest pain, sinus pain, hysterectomy follow-up, carpal tunnel pain, and knee pain. (Tr. 176-83). Lupus tests performed on January 11, 2002 were negative. (Tr. 177).

Plaintiff underwent x-rays of the right knee on November 28, 2000, which revealed a mild degree of arthritis. (Tr. 205).

Plaintiff presented to Steven Winters, M.D. on March 26, 2002 for evaluation of bilateral

carpal tunnel syndrome. (Tr. 140). Plaintiff reported experiencing symptoms in each hand since January of 2002. (Id.). Dr. Winters indicated that plaintiff's past history was significant for Raynaud's phenomenon. (Id.). He also noted that plaintiff had osteoarthritis in her knees. (Id.). A physical examination was positive for bilateral carpal tunnel syndrome. (Id.).

Plaintiff saw Dr. Winters for a follow-up on April 16, 2002. (Id.). Plaintiff reported that the injections helped for several days but the symptoms returned. (Id.). Plaintiff decided to undergo carpal tunnel release surgery on the right side. (Id.). Plaintiff underwent right carpal tunnel release on April 24, 2002. (Tr. 171-72).

Plaintiff saw Dr. Winters on May 2, 2002. (Tr. 139). Dr. Winters indicated that plaintiff had undergone carpal tunnel release of the right hand, and discussed with plaintiff performing the same surgery on plaintiff's left hand. (Id.).

Plaintiff saw Dr. Winters on June 11, 2002. (Id.). Dr. Winters stated that plaintiff's grip strength had increased to 40 pounds six weeks following surgery. (Id.). Dr. Winters indicated that plaintiff was doing well enough to undergo left carpal tunnel release surgery. (Id.). Plaintiff underwent left carpal tunnel release on July 17, 2002. (Tr. 168-69).

Plaintiff saw Dr. Winters for a follow-up after the left carpal tunnel release on July 25, 2002. (Tr. 138). Plaintiff's staples and sutures were removed. (Id.). Plaintiff saw Dr. Winters again on August 8, 2002, at which time Dr. Winters noted that plaintiff should work on hand exercises. (Tr. 137). Dr. Winters indicated that plaintiff should be able to return to work in one month. (Id.). Plaintiff saw Dr. Winters on September 5, 2002. (Id.). Dr. Winters stated that plaintiff's grip strength on the left was 50 pounds and her grip strength on the right was 65 pounds. (Id.). He released plaintiff to all activities as tolerated. (Id.).

Plaintiff saw Dr. Winters on December 12, 2002, at which time plaintiff complained of some incisional soreness over the left arm and some tenderness in the palm of the left hand. (Tr. 136). Dr. Winters prescribed Ultracet[8] and physical therapy. (Id.).

Plaintiff attended physical therapy at Ripley County Memorial Hospital in January and February of 2003. (Tr. 215-220).

On January 9, 2003, plaintiff reported that physical therapy had helped. (Tr. 135). Plaintiff indicated that her left arm was much better except for some incisional soreness over the elbow, and her right arm was tender in the shoulder and over the wrist. (Id.). Upon physical examination, Dr. Winters found that plaintiff appeared to have early de Quervain's tenosynovitis[9] and right shoulder impingement. (Id.). Dr. Winters prescribed a thumb splint and physical therapy. (Id.).

Plaintiff saw Dr. Winters for a follow-up of her right shoulder impingement syndrome and right wrist de Quervain's tenosynoitis on February 6, 2003. (Id.). Plaintiff reported experiencing good days and bad days but indicated that therapy had helped her significantly. (Id.). Plaintiff's grip strength was 55 pounds on the right. (Id.). Plaintiff had less tenderness over the wrist, although she still experiences some discomfort. (Id.). Dr. Winters indicated that plaintiff's shoulder was strongly positive for impingement. (Id.). Dr. Winters recommended an MRI of the right shoulder to determine if plaintiff had a partial rotator cuff tear. (Id.). He advised plaintiff to continue with her home exercise program for her shoulder and wrist. (Id.).

---

[8]Ultracet is indicated for the short-term (five days of less) management of acute pain. See Physician's Desk Reference (PDR), 2550 (59th Ed. 2005).

[9]Inflammation of the tendons of the first dorsal compartment of the wrist. Stedman's at 1795.

Plaintiff saw Dr. Winters for a follow-up of her right shoulder impingement on February 25, 2003. (Tr. 134). Dr. Winters indicated that an MRI confirmed a small partial tear at the insertion point of the supraspinatus tendon. (Id.). Plaintiff continued to manifest a positive impingement test. (Id.). Plaintiff's range of motion was 140 degrees of forward flexion and abduction. (Id.). Dr. Winters' assessment was right shoulder partial rotator cuff tear. (Id.). Dr. Winters prescribed Darvocet [10] and Vioxx,[11] and recommended that plaintiff continue with her shoulder exercises. (Id.).

On March 25, 2003, plaintiff reported having good days and bad days. (Id.). Upon physical examination, Dr. Winters found that plaintiff's forward flexion was 160 degrees and abduction was 150 degrees with slight discomfort. (Id.). Plaintiff's rotation of the right shoulder was good in strength and did not cause discomfort. (Id.). Dr. Winters' assessment was persistent lessening right shoulder symptoms of impingement. (Id.). Dr. Winters prescribed Darvocet and recommended that plaintiff continue with her exercises. (Id.). Plaintiff indicated that she did not feel her pain merited arthroscopic evaluation and decompression of the joint. (Id.). Dr. Winters discharged plaintiff from his care. (Id.).

Plaintiff underwent a total abdominal hysterectomy at Three Rivers Healthcare North Hospital on April 11, 2003. (Tr. 146-47). It was noted that plaintiff tolerated the procedure well. (Tr. 147).

A state agency medical consultant completed a Physical Residual Functional Capacity

---

[10]Darvocet is indicated for the relief of mild to moderate pain. See PDR at 402.

[11]Vioxx is indicated for the relief of the signs and symptoms of arthritis and for the management of acute pain. See PDR at 2174.

Assessment on July 8, 2003. (Tr. 90-98). The medical consultant expressed the opinion that plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit a total of about 6 hours in an 8-hour workday, and push or pull an unlimited amount in the lower extremities and a limited amount in the upper extremities. (Tr. 91). The medical consultant found that plaintiff could only occasionally climb ladders, ropes, or scaffolds, and plaintiff's abilities to balance, stoop, kneel, crouch, and crawl were not limited. (Tr. 93). The consultant stated that plaintiff's ability to reach in all directions with her right hand and her ability to handle were limited. (Tr. 94). The consultant also advised against constant, forceful grasping. (Id.). The medical consultant found no visual, communicative, or environmental limitations, except that plaintiff should avoid concentrated exposure to vibration. (Tr. 94-95).

Plaintiff underwent x-rays of the neck on July 9, 2003. (Tr. 211). The impression of the reviewing physician was mild degenerative arthritis involving the spine. (Id.). A CT scan taken of plaintiff's neck on July 17, 2003 was negative. (Tr. 213).

Plaintiff underwent an echocardiogram[12] on August 21, 2003, which revealed normal left ventricle wall motion and trace mitral regurgitation.[13] (Tr. 23).

Plaintiff underwent testing at University Hospitals and Clinics in November 2003, which revealed patterns frequently associated with systemic rheumatic diseases, such as lupus and rheumatoid arthritis, but it was not suggestive of a specific diagnosis. (Tr. 224).

---

[12]The record obtained by the use of ultrasound in the investigation of the heart and great vessels and diagnosis of cardiovascular lesions. Stedman's at 563.

[13]Reflux of blood through an incompetent mitral valve. Stedman's at 1546.

Plaintiff presented to Southeast Missouri Musculoskeletal and Osteoporosis Institute on December 4, 2003, complaining of constant pain from head to toe. (Tr. 229). The physicians noted a diagnosis of Raynaud's phenomenon. (Id.). Plaintiff returned for a follow-up on January 7, 2004, at which time fibromyalgia syndrome and Raynaud's phenomenon were mentioned. (Tr. 230). It was recommended that plaintiff quit smoking to help her Raynaud's phenomenon. (Id.). On April 7, 2004, plaintiff complained of continuing pain in her knees and neck as well as depression. (Tr. 231). On May 12, 2004, plaintiff reported having good days and bad days. (Tr. 232).

### The ALJ's Determination

The ALJ made the following findings:

1. The claimant is insured for a Period of Disability and Disability Insurance Benefits throughout the period of this decision.

2. The claimant has not engaged in substantial gainful activity since November 21, 2002, the day after the date her prior Title II/XVI applications were denied (20 C.F.R. §§ 404.1520(b), 416.920(b)).

3. The claimant has been more than minimally limited by arthritis of the cervical spine and knees, a partial right rotator cuff tear and Raynaud's disease (20 C.F.R. §§ 404.1520(c), 416.920(c)). Thus, she satisfies the requirement for a severe impairment.

4. The claimant's condition has not met or medically equaled a listing in 20 C.F.R. pt. 404, subpt. P, app. 1 (20 C.F.R. §§ 404.1520(d), 416.920(d)).

5. The claimant's allegations are not credible. (Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984); 20 C.F.R. §§ 404.1529, 416.929).

6. Since November 21, 2002, the claimant has had the residual functional capacity to lift, carry, push or pull up to ten pounds occasionally, sit six hours in an eight-hour day, and stand or walk a total of two hours in an eight-hour day, but she has required an option to stand or walk every forty-five minutes for periods of five minutes. She has also been able to bend and stoop occasionally, but she has been unable to perform forceful gripping and grasping, has had to avoid vibration to her

hands, has been unable to perform over-head work, and has had to avoid temperature extremes. 20 C.F.R. §§ 404.1567, 416.967.

7.      The claimant has been unable to perform her past relevant work since November 21, 2002 (20 C.F.R. §§ 404.1520(e), 416.920(e)).

8.      The claimant is a younger individual (20 C.F.R. §§ 404.1563, 416.963).

9.      The claimant has a high school education (20 C.F.R. §§ 404.1564, 416.964).

10.     The claimant has been able to perform work existing in significant numbers in the national economy since November 21, 2002 (20 C.F.R. §§ 404.1520(f), 416.920(f)). This finding is based on credible vocational expert testimony.

11.     The claimant has not been disabled as defined in the Social Security Act since November 21, 2002. Thus, she is not entitled to or eligible for, a Period of Disability, Disability Insurance Benefits or Supplemental Security Income.

(Tr. 14-15).

The ALJ's final decision reads as follows:

The claimant's applications for a Period of Disability, Disability Insurance Benefits and Supplemental Security Income, protectively filed on May 19, 2003, are denied in that the claimant has not been disabled in accordance with the Social Security Act. Thus, the claimant is not entitled to, or eligible for, a Period of Disability, Disability Insurance Benefits or Supplemental Security Income.

(Tr. 15).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.

See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's

ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059

(8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure

must be followed at each level of administrative review.  See id.  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this

special procedure, had to be completed at each level and a copy had to be attached to the ALJ's

decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e),

416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures

required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§

404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms,

findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1),

416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or absent."

20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree

of functional loss resulting from the impairments in four areas deemed essential to work:

activities of daily living, social functioning, concentration, and persistence or pace.  See

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform work-

related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.    Plaintiff's Claim on Appeal**

Plaintiff raises a single claim on appeal of the Commissioner's decision. Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity. Specifically, plaintiff claims that the ALJ failed to consider plaintiff's significant non-exertional limitations in assessing plaintiff's residual functional capacity.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogemeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863

(8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may

consider non-medical evidence, although the residual functional capacity finding must be

supported by *some* medical evidence.  See Lauer**,** 245 F.3d at 703.

In determining plaintiff's residual functional capacity, the ALJ first provided a summary of

the objective medical evidence.  The ALJ dismissed plaintiff's allegations as to fibromyalgia,

lupus, and depression, for want of a medically determinable impairment.  This result is supported

by the medical record.  Lupus tests performed in January of 2002 were negative.  (Tr. 177).  Tests

performed in November of 2003 revealed patterns frequently associated with systemic rheumatic

diseases, such as lupus, yet no specific diagnosis.  (Tr. 224).  Although physicians at Southeast

Missouri Musculoskeletal and Osteoporosis Institute mentioned fibromyalgia syndrome, no

physician has formally diagnosed plaintiff with fibromyalgia.  (Tr. 230).  Finally, the medical

record is devoid of evidence of treatment for depression.

With regard to plaintiff's remaining impairments, the ALJ accurately pointed out that there

is little medical evidence regarding plaintiff's impairments, and what evidence there is does not

support a finding of disability.  The ALJ noted that an x-ray of plaintiff's right knee taken in

November 2000 revealed only mild arthritis, and an examination of plaintiff's right knee

conducted at the Ripley County Family Clinic in May 2003 revealed only mild edema and that

plaintiff could fully extend the knee.  (Tr. 211, 175).  The ALJ stated that an x-ray of plaintiff's

cervical spine taken in July 2003 revealed only a mild degree of arthritis.  (Tr. 205).  The ALJ

next stated that although plaintiff sustained a partial right rotator cuff tear in early 2003, Dr.

Winters reported that physical therapy provided some relief.  (Tr. 135).  Dr. Winters also noted

that plaintiff had good strength in her right shoulder, and was able to forward flex and abduct with

only slight discomfort. (Tr. 134). Further, on March 25, 2003, plaintiff indicated to Dr. Winters

that her pain was not severe enough to warrant surgery. (Id.). The ALJ pointed out that

although doctors at Southeast Missouri Musculoskeletal and Osteoporosis Institute noted that

plaintiff carries a diagnosis of Raynaud's disease, they did not associate any limitations with this

condition.

After discussing the objective medical evidence and plaintiff's own statements regarding

her impairments, the ALJ concluded:

> [i]n light of the foregoing, the undersigned finds that, since November 21, 2002, the
> claimant has had the residual functional capacity to lift, carry, push or pull up to ten
> pounds occasionally, sit six hours in an eight-hour day, and stand or walk a total of two
> hours in an eight-hour day, but she has required an option to stand or walk every forty-
> five minutes for periods of five minutes. She has also been able to bend and stoop
> occasionally, but she has been unable to perform forceful gripping and grasping, has had
> to avoid vibration to her hands, has been unable to perform overhead work, and has had
> to avoid temperature extremes. This constitutes a limited range of sedentary work.

(Tr. 13).

The ALJ's residual functional capacity assessment is supported by the record as a whole.

Notably, none of plaintiff's treating physicians imposed any functional limitations on plaintiff.

Rather, the record reveals that plaintiff received little treatment for her various impairments and

the treatment plaintiff received was rather conservative. The objective medical record is

consistent with the ability to perform a limited range of sedentary work. In addition, residual

functional capacity formulated by the ALJ is consistent with the assessment of the state agency

medical consultant. The state agency medical consultant expressed the opinion that plaintiff could

occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk about 6

hours in an 8-hour workday, sit a total of about 6 hours in an 8-hour workday, and push or pull

an unlimited amount in the lower extremities and a limited amount in the upper extremities. (Tr.

91). The medical consultant further found that plaintiff's ability to reach in all directions with her right hand and ability to handle were limited, and that plaintiff should avoid constant, forceful grasping, and concentrated exposure to vibration. (Tr. 94-95). The ALJ incorporated all of these restrictions in his residual functional capacity.

The ALJ's residual functional capacity is also consistent with plaintiff's own testimony. Plaintiff testified that she can sit for thirty minutes to an hour, which is consistent with the ALJ's finding that plaintiff requires an option to stand or walk every forty-five minutes for periods of five minutes. (Tr. 262). Plaintiff also testified that she cannot lift her arm over her head due to shoulder pain, and that she experiences difficulty gripping. (Tr. 257-58). The ALJ took these restrictions into account when he found that plaintiff was unable to perform forceful gripping and grasping, must avoid vibration to her hands, and is unable to perform overhead work. Further, the ALJ noted that plaintiff testified that her last job ended because she was scheduled for carpal tunnel surgery, and this condition is no longer alleged as an impairment.

Plaintiff also argues that the ALJ erred in not obtaining additional medical evidence regarding plaintiff's fibromyalgia, lupus, Raynaud's disease, and depression. This argument is also unpersuasive. It is true that the ALJ has a duty to fully develop the record, particularly where a claimant is not represented by counsel. See Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981). This inquiry, however, is limited to whether the claimant was prejudiced or unfairly treated by the ALJ's development of the record. See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). As discussed above, the ALJ discussed these impairments and properly found that they were not substantiated by the medical record. There was sufficient evidence in the medical record for the ALJ to make this determination. Thus, plaintiff was neither prejudiced nor unfairly

treated by the ALJ's development of the record regarding plaintiff's impairments.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this  14th  day of September, 2006.

*Lewis M. Blanton*

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE